[Civ. No. 1122. Third Appellate District.—December 20, 1913.]

## THOMAS A. ROSEBERRY, Respondent, v. RICHARD B. CLARK, Appellant.

WATER-RIGHTS—SPRINGS AND STREAM—PAROL GRANT—ADVERSE USER.
In this action to restrain the defendant from interfering with the plaintiff's use of water from a stream formed by springs situated on the defendant's land, the evidence shows a parol grant to the plaintiff to appropriate the water, followed by all the elements of adverse use under claim of right for more than the statutory period.

ID.—PRESCRIPTIVE RIGHT TO WATER—INJUNCTION TO PROTECT.—If the plaintiff in such case, with the knowledge and acquiescence of the defendant who owns the land on which the springs are situated and who had the prior right to the water, constructed a dam and appropriated the water of the stream notoriously and continuously, under claim of right, for more than ten years, he thereby acquired a prescriptive right to the continued use of the water, entitling him to an injunction against interference by the defendant.

ID.—EXTENT OF RIGHT TO USE WATER—COMPROMISE AGREEMENT—EVIDENCE TO SUSTAIN.—The defendant not only failed to maintain his proposition that the plaintiff's use of the waters of all the springs was a mere permissive use and never developed into a use adverse to the interests of the defendant, but he also failed to maintain his proposition that, by the terms of an agreement upon which a compromise was had in a prior suit involving the same waters, the plaintiff was entitled only to the use of the waters of two springs, and nothing more.

APPEAL from a judgment of the Superior Court of Modoc County and from an order refusing a new trial. Clarence A. Raker, Judge.

The facts are stated in the opinion of the court.

N. A. Cornish, C. S. Baldwin, and E. C. Bonner, for Appellant.

N. J. Barry, for Respondent.

CHIPMAN, P. J.—This is an action to restrain defendant from interfering with plaintiff's use of certain water. The cause was tried by the court and plaintiff had judgment perpetually enjoining defendant from diverting or otherwise obstructing plaintiff in the use of said water. Defendant appeals from the judgment by the alternative method.

It is alleged in the complaint that for more than twenty years prior to the commencement of the action (complaint filed June 28, 1911), "plaintiff was and now is the owner of the west ½ and the west ½ of the southeast ¼ of section 20, township 39 north, range 9 east, in Modoc County; that, upon the southwest ¼ of the southwest ¼ of section 21, and the northwest ¼ of the northwest ¼ of section 28, said township, there are several springs whose waters flow to a point in the northeasterly part of the northeast ¼ of the northeast ¼ of section 29, said township, and there unite and flow between well-defined banks in a well-defined channel and would naturally thus flow in a southwesterly direction into what is known as Ash Creek"; that while such owner, and more than twenty years before the commencement of the action, plaintiff "entered upon the northeast ¼ of said section 29, where all the waters of said springs were united and were flowing in their natural and well-defined channel and well-defined banks, and constructed a dam in the channel of said stream of sufficient strength and capacity to divert all of the waters flowing in said stream, and then constructed a ditch of sufficient capacity and grade to carry all the waters flowing in said stream from said dam across the N. E. ¼ of N. E. ¼ of said section 29, to and upon the south half of the above described land of plaintiff, and at that time diverted all the waters of said stream into said ditch by means of said dam and by means of said ditch conveyed all the waters of said stream to and upon the south half of said lands of plaintiff"; that at said time one C. J. McCoy and one T. I. Talbott were

the owners of the land on which said springs were located and upon which said dam was located; "that said appropriation of said water, the construction of said dam and the construction of said ditch and the conveyance of said water were made by the permission and with the consent of the said C. J. McCoy and T. I. Talbott; that the plaintiff ever since the construction of said dam and said ditch as aforesaid, has used all of said water upon his said lands and by means of all said water has irrigated the south half of said lands and watered stock thereon, during the irrigating season of each and every year and has made said south half of said land productive and of great value" and has thus raised valuable crops of hay and grain each year for more than twenty years next before this action was commenced; that during all said time since appropriating said waters as aforesaid plaintiff has been in the possession and use of said waters for said purposes "under claim of right and title thereto, and for more than twenty years next preceding the commencement of this action has peaceably, quietly, openly, notoriously, continuously, uninterruptedly, and adversely to the whole world and particularly to the defendant and his grantors and under claim of right and title as against defendant and his grantors, used, diverted, appropriated, and controlled all of the waters of said springs and said stream and has conveyed the same" to his said lands "under claim of right and title peaceably, . . . and adversely . . . and has used said waters upon his said lands" as hereinabove set forth "and is now entitled to use, appropriate, divert, and control said waters" for said purposes, "and would now enjoy the use of the same, except for the wrongful acts of defendant hereinafter alleged." It is then alleged that said lands are situated in an arid climate and are themselves arid and that artificial irrigation is indispensable to the profitable use of said lands, but with the use of all said waters they are and can be made to continue to be profitable for agriculture; that during the month of June, 1911, defendant willfully and wrongfully diverted the waters of said springs and conveyed the same to his own lands and thereby deprived plaintiff of the use thereof and thereby prevented plaintiff from watering his said crops and defendant threatens to continue to divert said waters to plaintiff's injury in the particulars fully set forth.

Defendant denies the material averments of the complaint as to the alleged appropriation of said waters and alleges that, "prior to August 18, 1896, defendant and his grantors, as appropriators and riparian owners, were the owners of the right to use, and did each and every year use all the waters of said springs and said stream, for their lands hereinafter described for watering stock and domestic purposes. That all the use that plaintiff ever had of any of said waters was a permissive use, that is to say at such times as defendant and his grantors were not using said waters for irrigation and other purposes, they would permit the same to pass down from said springs and the said stream, making no objection to said waters at such times being used by plaintiff" but not otherwise, and at all times plaintiff's use "has been subject to the superior rights and subservient to the prior claims and rights of defendant and his grantors." It is further alleged that, about August 18, 1906, defendant transferred and released to plaintiff "two certain springs rising and situate on the northwest quarter of the northwest quarter of section 28," said township, "since which time plaintiff has used the water from said springs without let or hindrance from defendant"; and except as to said two springs plaintiff has no right to any of said waters; denies that defendant has obstructed the waters of said two springs but admits that except as to the waters of said two springs defendant has diverted said other waters; denies that he threatens to interfere otherwise with any of said waters. Defendant then alleges ownership in himself and his grantors, for more than twenty-five years, of the said land in sections 21 and 28 and also certain land in section 20, adjoining plaintiff's land on the east; that up to August 18, 1906, they used all the waters of all said springs on said land for irrigation and domestic purposes and since said above mentioned date defendant has used for like purposes all of said waters except the waters of the two springs above referred to and such use by himself and his grantors has been open . . . and adverse to the whole world and particularly to plaintiff except as above stated. Defendant prays that his rights be determined and he be adjudged entitled to all said waters except as above stated.

The court made findings in favor of plaintiff substantially as alleged in the complaint and found adversely to defendant's averments of the answer.

Briefly stated: Plaintiff claims all the waters involved by prior appropriation and by adverse use for more than the statutory period. Defendant claims that he and his predecessors, during all the time involved and up to about August 18, 1906, appropriated and used all the water involved except as they permitted plaintiff to use the water on occasions when they were not using it and except that about August 18, 1906, plaintiff obtained a right to the water of two springs rising on said section twenty-eight, and that the use by defendant and his predecessors was adverse to plaintiff and the whole world.

Appellant presents but two propositions in his brief: 1. That plaintiff's "use of the waters of all the springs was a mere permissive use and never developed into a use adverse to the interests of McCoy and Talbott, or their successors"; 2. That "by the terms of an agreement upon which a compromise was had, in the suit of Roseberry *v.* Vogt, respondent is entitled to the use of the waters of two springs in the south field (section 28) and nothing more."

1. In support of his first point appellant refers to the averment of the complaint as follows: "That said appropriation of said water, the construction of said dam, and the construction of said ditch, were made by the permission and with the consent of said C. J. McCoy and T. I. Talbott." Reference is also made to some but not all the testimony bearing upon the circumstances under which the appropriation was made. Plaintiff testified that, in the spring of 1891, he constructed a dam in the stream below the point where the water of all the springs united and, by means of a ditch constructed at the same time, he diverted all the water of the stream to and used it upon his land during that irrigating season. This fact is testified to by witness William Henry and witness A. B. Jones, who did the work under plaintiff's direction and assisted in irrigating his land. This dam was situated on the Talbott land (section 29) and at first the ditch was run north to the section line and thence along the line between sections twenty and twenty-nine to plaintiff's land. Plaintiff testified: "Q. Did Mr. Talbott, the owner of the land on which

the dam was constructed, know you were building it? A. I suppose he did; I saw him prior to that time and obtained his consent and permission to construct the dam there. Q. He gave you the right to construct the dam? A. He did." Later there was a change made in the location of the ditch which the witness explained: "A. Mr. Talbott came to me during the fall of 1891, or spring of 1892, and stated, he says: 'Tommy, there is lots of water down there, isn't there, in that stream, more than I thought there was, and I am awful glad you got it; it will irrigate your lands and make them valuable,' or words to that effect; 'but why didn't you dig that ditch right down through my field and then turn it onto your land'? I said, 'Mr. Talbott, I didn't want to dig up your land any more than possible, and I got to the fence as soon as I could and continued down the fence.' He said, 'I would rather it should be there; I will dig that ditch from your dam, and dig it through my field so I can get the percolation, and when you do not want to use the water I will turn it down there.' " Mr. Talbott made the change, extending the ditch beyond where plaintiff used it, and plaintiff thereafter took the water from this new ditch at a point where it passed near the southeast corner of his land. "Q. Was there any change in the use of the water after the new ditch was dug? A. No, sir; I used the water just the same, or always directed the men to do so; if any one else got it it was unbeknown to me. Q. Did Mr. McCoy, the man who owned the land where the springs were located, know you were making the dam and taking the water to your land? A. He did. Q. Did you ever have a talk with him about it? A. I did. Q. State the conversation. A. Well, prior to the time of building the dam I saw Mr. McCoy regarding the water flowing down, and told him that I wanted to appropriate those waters and take them down to my place, coming from the spring. He told me he would be only too glad for me to do so; that he had thought at one time of building a dam right where his fence crossed one of the streams (pointing on map); this fence is not exactly on the line, but it is supposed to be. There used to be an old lane running through there, and his fence was built north of that lane, which would make a twenty-foot strip of McCoy's land over here in Talbott's land, and he had built a kind of crib right

there a year or two before, and he intended at that time to make a dam out of it, but abandoned that idea, and therefore, he said this would be what he wanted, if I would raise the water up and percolate his land. He had more water than he wanted on his land anyway; it was wet and springy, and this putting a dam in there would be what he wanted; and he not only allowed me to do it, but assisted me in building a levee along there to hold the water in the channel some place along here. (Pointing on map). Q. Did he know you were going to take the water out on to your own land? A. Yes, sir.''

There was evidence that plaintiff through his several tenants continued the use of the dam and ditch and the waters of this stream without interruption until, in 1905, the McCoy land had passed into the ownership of one John Vogt and so also had the Talbott land changed ownership. The witness was asked if any interference with his use of the water of that stream had been made since his first diversion, and replied: ''There was never any interference or objection that I ever knew of until Mr. John Vogt.'' This was in 1905 and gave rise to the suit above referred to in defendant's second point. Defendant Clark became the owner of the McCoy land and in 1909 and 1910 he interfered with the use of the water by plaintiff which caused plaintiff to bring the present action. With these exceptions plaintiff testified that his use had never been interfered with. Plaintiff rented his ranch in 1902 and from that time to the present his tenants, as appears from the evidence, used the dam, ditch, and all the water uninterruptedly under plaintiff's claim of right. Witness Shaw testified to having worked on the ranch in 1892, 1893, 1894, and 1895 and that he helped to irrigate the land, using plaintiff's dam and ditch and taking practically all the water. Witness Anderson was plaintiff's tenant for four years, 1893-1896. He testified that he worked on the dam to keep it in repair and on the ditch; that he used all the water and no one else used it during those years and no one claimed it except plaintiff, or interfered with its use. He testified to having had a conversation with Talbott about the water as follows: ''The old gentleman asked me how I was getting along with the ranch. I says 'first rate except a little trouble with the dam.' I

says, 'the dam leaks a good deal sometimes and makes a good deal of bother.' He says, 'I wish Tommy'—he always called Mr. Roseberry Tommy—'I wish Tommy would get a good dam in so he can get all that water, because I gave him that water and I would like to see him make good use of it.' '' Witness Harvey farmed the land in 1899. He testified to the uninterrupted use of the dam, ditch, and water on plaintiff's land and that no one else used it or claimed it to his knowledge. Witness Mrs. Ramsey, whose husband, now dead, was plaintiff's tenant in 1897, testified to her husband having irrigated the ranch that year. He could not have done so except by means of this dam and ditch. Witness Taylor was the nominal tenant of plaintiff for the years 1900 and 1901, defendant Clark being the renter in fact. The Talbott land was rented to one Morgan with whom Clark was not on good terms and, in order to avoid trouble about getting water to the Roseberry land, he put Taylor forward as the real renter. Taylor got water for the Roseberry land as others had done by complying with certain requirements made by Morgan which did not, as we read the evidence, carry any necessary implication impeaching plaintiff's right to the water. Witness John Vogt was plaintiff's tenant for the year 1902. This was before he had acquired the McCoy land where the springs were located. He testified that he and plaintiff repaired the dam and ran the water to plaintiff's land and used it by means of the said ditch; that defendant had land rented that year and witness, with plaintiff's consent, allowed defendant to use some of the water once. With this exception witness used all of the water and no claim was made to it by any one except plaintiff. The tenants of plaintiff's land for 1908 were not called, but witness Roberts testified to having ''kept track of the crops for Mr. Roseberry . . . measured the hay and kept track of the grain''; that in 1906 he worked on the dam and ditch for plaintiff and brought the water to his land; that for the last number of years crops were raised on plaintiff's land by irrigation; that no one else made any claim to the water and no one interfered with him when working on the dam and ditch. Witness Myers worked with Roberts on the dam and ditch in 1906 and brought the water to plaintiff's land. He testified that John Vogt ordered them

to stop work, but they went on with the work without other interference. Witness John Kresge worked for plaintiff on the dam and ditch in May, 1906, and helped to bring all the water of the stream to plaintiff's land. Vogt told them not to touch the dam, but they "paid no attention to him." Witness Strong testified that he had farmed plaintiff's land as tenant every year since 1905; that he used the dam and ditch in question and the water of said stream which was diverted by the dam; that Vogt did not interfere with his use of the water, but that defendant, in 1909, "shut the water off" and has been "interfering with that water ever since."

It appeared that, in the lease under which John Vogt rented plaintiff's land in 1902, Vogt expressly agreed to "build in a strong and workmanlike manner a rock dam in the stream of water near (describing the dam site) at the point in said stream where there is at present a dam constructed of wood and earth." This dam was to be sufficient to hold the waters of said stream. He also agreed "to widen and clean out the main ditch on the said leased lands so as to flow the waters from said dam easily through and across said leased lands."

Defendant introduced testimony in conflict with the foregoing so far as it related to the use of the water of this stream, but he introduced no evidence controverting the right under which plaintiff originally made his appropriation. We think the evidence showed something more than a permissive use of the water or a mere license. It seems to us that a parol grant to appropriate the water followed by all the elements of adverse use under claim of right for more than the statutory period, is shown.

There can be no doubt that plaintiff made his appropriation under claim of right to the water, with the knowledge and acquiescence of the persons, McCoy and Talbott, having the prior right, and his use was notorious, continuous, and was uninterrupted for certainly more than ten years. Such a use would carry with it a presumptive grant. (*Faulkner* v. *Rondoni*, 104 Cal. 140, 146, [37 Pac. 883].) But we think plaintiff has shown also a parol grant followed, as we have said, by adverse use. Our conclusion is that appellant has not maintained his first proposition.

2. On February 5, 1906, a second amended complaint was filed in said court in which Roseberry was plaintiff and John Vogt defendant. This complaint is similar to the complaint in the present action except that it alleges that on the said land in said sections 21 and 28 "there are located two certain springs of water." It is further alleged "that all of the waters flowing from said springs unite and form one stream of water," continuing in its averments about as in the present complaint. The purpose of the action was to restrain Vogt, the then owner of the land on which the springs were located, from interfering with the use of the water by plaintiff. On the eighteenth day of August, 1906, while the action was pending, an agreement in writing was executed by Roseberry, Vogt, and this defendant, Clark, reciting the pendency of said action and the desire of the parties to settle the water-right referred to in the action, and agreeing that Roseberry "is the owner of all the waters and water-rights, dams and ditches described in said complaint, and that he is the owner of and has the right to divert, by means of said dam and ditches described in said complaint, all of said waters and use the same upon the land described in the complaint." The agreement seems to have contemplated the dismissal of the action, but, on August 22, 1906, the court made and entered its decree "by stipulation on file herein, that all of the allegations of the complaint are true . . . and findings of fact and conclusions of law having been expressly waived by counsel for the respective parties herein: It is by the court ordered, adjudged and decreed," etc., adjudging plaintiff's right to the water by him claimed and enjoining defendant from interfering therewith.

These proceedings were introduced by defendant for the purpose of showing that plaintiff at that time claimed the water of two springs only, which defendant now contends were the two south springs on section twenty-eight. Plaintiff contends that his reference to two certain springs meant the two groups located on sections twenty-one and twenty-eight whose waters he had long been using. It was conceded by both parties that the complaint, the decree, and the agreement are ambiguous and uncertain and, without objection, both parties introduced testimony to show what was meant

by them in signing the agreement and stipulating as to the decree.

In reply to the question "What waters were involved in that suit?" the plaintiff testified: "A. All the waters flowing down that channel from springs in the S. W. ¼ of S. W. ¼ of section 21 and the S. W. ¼ of the N. W. ¼ of section 28. Q. Did that suit have reference solely to what is known as the springs in the south field? A. Not at all. All the waters coming down those channels and caught up by my dam from all the springs. . . . Q. You understood, did you not, Mr. Roseberry, that you were to have everything you sued for? A. Yes, sir. . . . They simply quit. . . .

Q. You supposed by that agreement that you were to have all the water that came down? A. Yes, sir; most surely, both the north and south springs and all the water, according to the agreement had with Mr. McCoy. Q. Did they understand it that way? A. I don't see how they could help it. Mr. John Vogt and Dick Clark when we were at Auble's—I was foolish enough to go there alone with the rest of the crowd. We talked about it and Dick said, 'I might want to stop a spring.' I said, 'Dick, you never saw me when I was not ready to meet you half way.' Q. Did you say to John Vogt, or in his presence, that you had settled the matter, and that you both had water? A. No, sir. I had what the complaint called for. Q. And they simply quit? A. Yes, sir." There was testimony introduced by defendant that the understanding was as is now claimed by him and in direct conflict with plaintiff's testimony. There were circumstances connected with the case which, together with the fact that plaintiff had for so many years claimed and used all the water of all the springs, might have led the court to accept plaintiff's testimony. It was accepted by the court and so must it be by us.

In our opinion defendant failed to sustain his second proposition.

The claim that the evidence is insufficient to support certain specified findings of fact we think sufficiently met by the foregoing examination of the evidence.

The judgment is affirmed.

Hart, J., and Burnett, J., concurred.